[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 1, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-14326

_____

D.C. Docket No. 03-00027-CR-T-24-TGW

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES MAXWELL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(OCTOBER 1, 2004)

Before EDMONDSON, Chief Judge, TJOFLAT and COX, Circuit Judges.

TJOFLAT, Circuit Judge.

A jury found James Maxwell guilty of two counts of knowingly possessing

child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).[1]  As a

———————————————

[1]  That section of the statute provides,

Any person who . . . knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer . . . shall be punished as provided in subsection (b).

Definitions of § 2252A's terms are contained in 18 U.S.C. § 2256.  We reprint § 2256, as it read at the time of Maxwell's indictment, below.  The section was amended just days before Maxwell's trial, see Pub. L. No. 108-21, tit. V, § 502(a) to (c), 117 Stat. 678, 679 (2003), but the amendments are of no moment in this case.

§ 2256.  Definitions for chapter

For the purposes of this chapter, the term—

(1) "minor" means any person under the age of eighteen years;
(2) "sexually explicit conduct" means actual or simulated—
(A) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
(B) bestiality;
(C) masturbation;
(D) sadistic or masochistic abuse; or
(E) lascivious exhibition of the genitals or pubic area of any person;
(3) "producing" means producing, directing, manufacturing, issuing, publishing, or advertising;
(4) "organization" means a person other than an individual;
(5) "visual depiction" includes undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image;
(6) "computer" has the meaning given that term in section 1030 of this title;
(7) "custody or control" includes temporary supervision over or responsibility for a minor whether legally or illegally obtained;
(8) "child pornography" means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—
(A) the production of such visual depiction involves the use of a minor engaging

jurisdictional element of the offense, the statute required the Government to prove that the child pornography, or at least the material that produced it, traveled in interstate commerce. At Maxwell's trial, the Government did not establish that the child pornography moved across state lines. Consequently, its case relied on establishing that the images were <u>produced</u> by materials that did.

Maxwell appeals his convictions on four grounds. The first three grounds are insufficient to warrant reversal. The fourth ground is that the application of § 2252A(a)(5)(B) to the facts of his case amounts to an unconstitutional exercise of the Commerce Clause. That ground has merit and requires that we reverse

in sexually explicit conduct;
(B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;
(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or
(D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct; and
(9) "identifiable minor"—
(A) means a person—
(i)(I) who was a minor at the time the visual depiction was created, adapted, or modified; or
(II) whose image as a minor was used in creating, adapting, or modifying the visual depiction; and
(ii) who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature; and
(B) shall not be construed to require proof of the actual identity of the identifiable minor.

18 U.S.C. § 2256 (1996) (amended 2003).

3

Maxwell's convictions.

## I.

Maxwell rented a room in Alberta Wallace's apartment in St. Petersburg, Florida from May until August of 2002. During that time, Maxwell used Wallace's computer to access the Internet, and she had access to Maxwell's mail and computer accounts. Wallace eventually grew suspicious that Maxwell was interested in homosexual Internet activity, some involving children, and she contacted the police about her concerns.

Wallace allowed the Federal Bureau of Investigation to search her apartment. FBI agents copied the contents of Wallace's computer hard drive and seized almost 140 items. Most of these items consisted of computer disks and film taken from Maxwell's room. One item was a zip disk[2] containing several hundred images of child pornography.

Subsequent to the search, Wallace found additional disks in a drawer in Maxwell's room, and she turned them over to the FBI. One was a floppy disk containing about fifteen images of child pornography.

---

[2] Special Agent Keith Arndt of the FBI, a specialist in examining evidence on computers and other digital media, described zip disks at Maxwell's trial. According to Arndt, zip disks are removable devices that are used to store computer files, much like standard floppy disks. The technology that facilitates storage is slightly different for zip disks than it is floppy disks, and zip disks therefore can only be used in computers that are equipped with a zip drive. Zip disks are capable of storing substantially more information than floppy disks.

In January 2003, a grand jury indicted Maxwell on two counts of possessing child pornography in violation of 18 U. S. C. § 2252A. Count I was predicated on the zip disk described above. Count II was predicated on the floppy disk. (We refer to these two disks collectively as "the charged disks.")

Maxwell was arraigned in February, plead not guilty, and stood trial in May. The Government presented the testimony of Wallace and several law enforcement officials from various agencies.

Wallace testified that she knew Maxwell from church and dated him briefly after her husband passed away. They stopped dating after a short time, in part because Wallace was offended when she learned that Maxwell was living with an unmarried couple that engaged in sexual relations (with one another, not Maxwell). By the time Maxwell moved in to Wallace's apartment, he and Wallace were merely platonic friends and slept in different rooms. No one else had a key to the apartment or stored possessions there. At first, Maxwell accessed the Internet with his own computer, but he began using Wallace's computer, with her permission, after his Internet service was disconnected. In August 2002, Maxwell

5

moved out of the apartment.[3] He gave Wallace power of attorney to manage his

personal affairs for the time he would be gone. She had access to his bank account

and paid bills for Maxwell's various expenses, including moving and cell phone

expenses. Maxwell also gave Wallace access to his personal post office box and

e-mail accounts. Around the beginning of September, in the course of her

stewardship, Wallace says she discovered e-mail messages involving

homosexuality and teenagers in Maxwell's accounts. When Wallace questioned

him about those messages, he became angry, and the two never spoke to one

another prior to Maxwell's trial. In October, Wallace contacted the police about

her suspicions that Maxwell accessed (and possibly possessed) child pornography.

She allowed the FBI to search Maxwell's former room and observed agents

seizing items that Maxwell had moved into that room. Wallace testified that she

had two filing cabinets of her own in Maxwell's room, but they only contained

materials she used for teaching. She stored no computer disks of her own in

Maxwell's room (in the filing cabinet or otherwise) and never used Maxwell's

disks. Furthermore, Wallace never gave anyone else (other than the FBI) access to

---

[3] Maxwell left Wallace's apartment to serve a prison sentence for an unrelated state offense, but Wallace was not asked to explain this reason for Maxwell's absence in front of the jury. Maxwell intended to return to the apartment following his release. Because of Wallace's concerns and the events that followed, however, he never did return.

Maxwell's room or computer disks. In addition to the room, Wallace permitted the FBI to examine some of her belongings, including the laptop computer Maxwell used to access the Internet. Wallace testified that she never viewed child pornography on that computer and never let anyone other than Maxwell use it. A few days after the FBI search, Wallace found some additional computer disks that she identified as belonging to Maxwell and forwarded them to the FBI. She never used those disks or allowed others to use them.

The Government introduced into evidence a wide array of physical exhibits, including the charged disks. The zip disk, corresponding to Count I, was admitted as Government Exhibit 5A. Its label, which was published to the jury, contained the following handwritten words: "adult and young," "pre teens," "piss," "shaved," and "pierced." The word "animals" also appeared but had been crossed out. The floppy disk, corresponding to Count II, was admitted as Government Exhibit 7. Although these two disks—along with several others that were not charged in Maxwell's indictment—were admitted as physical exhibits, the court precluded the jury from viewing their contents with this exception: the Government was permitted to offer into evidence as separate exhibits hard copies made of portions of the disks. Some of the hard copies were images of child pornography. The court permitted the Government to admit a total of ten such

7

hard copy images from all of the disks in evidence, and the Government chose to introduce images from the two charged disks only (even though other admitted disks in evidence also contained pornographic images).[4]

Agent Philippe Dubord of the Hillsborough County Sheriff's Office was assigned to the "Innocent Images Task Force" with the FBI and investigated Maxwell's case. Dubord identified and described the charged disks, along with corresponding exhibits showing information about the files contained on those disks (such as the names of the files, when they were saved on the respective disks, when they were last accessed, and the names of the directories in which they were stored). The names of the folders in which some of the images were saved included "adult," "young," and "pre teen." On cross-examination, Dubord conceded that neither of the charged disks contained files bearing Maxwell's name or picture (although such contents did appear on other disks that were found among Maxwell's possessions).

Other prosecution witnesses identified two of the persons depicted on the charged disks as minor children, one from Florida and the other from Texas. Special Agent Susan Koteen of the Florida Department of Law Enforcement

---

[4] Although the prosecution did not show the jury images contained on the uncharged disks, it did elicit testimony that those disks contained images of child pornography.

testified that she recognized the physical surroundings shown in the images involving the Florida child. She identified them as the child's home, located in Howie-in-the-Hills, a small town in Lake County, Florida. Detective-Sergeant Katherine Davis of Angleton, Texas identified the Texas child but could not determine where the photographs were taken.

As additional circumstantial evidence that Maxwell knowingly possessed pornographic images, the Government introduced a recording of a phone conversation between Maxwell and his pastor, Linda Sessler.[5] The Government played the recording at trial and distributed a transcript of its contents to the jury. Maxwell initiated the phone call on November 10, 2002 (three days before the FBI searched Wallace's apartment) from the Hillsborough County jail, where he was being held on unrelated charges. During the call, Sessler indicated that law enforcement officials planned to search his belongings at Wallace's apartment. Maxwell responded,

> Well do me a favor . . . umm, get my floppy disk and all of my zip disks from [Wallace]. 'Cause some of it I have recipes and stuff on and, and some of them I had started journals and stuff. And some stuff I have that was long before genesis and stuff. But just get all of

---

[5] This evidence was admitted through the testimony of Katherine Cochran of the Hillsborough County Sheriff's Office, who monitored the telephone system at the Hillsborough County Jail used by inmates there. Cochran explained that all inmate phone calls were recorded and that warnings to that effect were visibly posted near the prison phones.

that stuff.  But I can, some of I can't remember what it is.  And some of it I have been wiping out some of the disks.  And uhh, just get all of that stuff and put it somewhere.

(Ellipses in original).  Sessler asked if the materials to which Maxwell was referring were labeled.  He replied,

It was just a big box.  It had a bunch of floppy disks.  And then there was the zip disks that are about the size of a floppy they're just a little bit bigger.  It doesn't have anything to do with uhh, anything that they were talkin' about.  But as you had said there's no more problems needed and so that would alleviate that.  But I was, I woke up in the middle of the night and last night I was sick, I had a fever and everything.  I don't know what was going on. . . .  And I said let me ask you about that again.  And just ask you to do that.  But just all of my floppy disks and my zip disks.  Just take them and just put 'em somewhere.

Sessler indicated doubt about this instruction and surmised to Maxwell that law enforcement authorities were "just tryin' to see if they can find anything."

Maxwell agreed.  He said,

Right, well that's why, that's why . . . that would just solve any problems that might would come up.  Like you said, like if they totally had to have a [unintelligible] come in and look but in case they don't or in case they do, you know . . . it keep the problems down.

(Both ellipses and alteration in original).

Over Maxwell's objection, the Government also introduced a plethora of testimony and exhibits into evidence concerning Maxwell's conduct beyond his possession of the charged disks.  This evidence concerned several other computer

10

disks containing depictions of child pornography that were seized from Wallace's home but were never charged against Maxwell in his indictment (collectively, the "uncharged evidence"). These materials consisted of a CD-Rom, two zip disks, and thirteen floppy disks. The uncharged evidence also included testimony and exhibits concerning Maxwell's e-mail accounts with online services including Yahoo and MSN Hotmail. The Government introduced records supplied by Yahoo indicating that Maxwell established a user profile under the name "boy_lover69_69."[6] Dubord testified about evidence indicating that Maxwell had accessed a Yahoo Internet group where files could be shared among users.[7] Although Dubord could not access the files stored on that group's website and could not say for certain whether Maxwell did, Dubord observed that the website contained three folders that were associated with Maxwell's account and entitled "boys," "boys 2," and "boys 3." The Government also introduced testimony and evidence about certain messages Maxwell received on his MSN Hotmail account. These messages contained subject lines suggesting that Maxwell had become a

---

[6] User profiles connected to an Internet account are like online identities created by the account user. Other Internet "surfers" can learn about the account user by reading his profile, and they can often contact him through it or share files with him if they so desire.

[7] According to Agent Dubord, Internet "groups" are websites "where people have a common interest where they . . . meet and chat, post messages, . . . share pictures, . . . [and] interact basically." Dubord testified that the title of an Internet group will often identify the group's interests.

member of Internet groups named "Rex's place for gay/bi boys :)"; "gay and bi boys (teens)"; and "Daily Digest for gay&bi teen guys." Dubord could not say however, whether Maxwell ever accessed these groups after becoming a member. Finally, Dubord testified about nine uncharged images of child pornography discovered in temporary Internet folders on Wallace's computer.[8]

Before it rested its case-in-chief, the Government asked the court to read a stipulation to the jury concerning the purported relationship between Maxwell's charges and interstate commerce. The court complied and informed the jury as follows:

> It is stipulated and agreed between the parties that the computer zip disk that is the basis for Count 1 of the Indictment, and the computer floppy disk that is the basis for Count 2 of the Indictment, were both manufactured outside the State of Florida and have been mailed, shipped or transported in interstate commerce.

The Government then rested. Maxwell put on no defense and also rested.[9]

On May 7, 2003, after approximately two hours of deliberation, the jury returned a verdict finding Maxwell guilty of Counts I and II. On August 12, the

---

[8] Software programs that facilitate Internet use often store information accessed on the Internet on the user's computer in temporary folders. The programs typically create these folders automatically and without the user's direction.

[9] Maxwell did, however, move for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. The court denied the motion.

court sentenced him to a total of sixty-six months in prison.[10]

## II.

Maxwell appeals his convictions on four distinct grounds.  We address each in turn in Subparts A. through C. below.  We begin with Maxwell's nonconstitutional arguments.  See, e.g., Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 445, 108 S. Ct. 1319, 1323, 99 L. Ed. 2d 534 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").  Because none of these arguments permit us to dispose of Maxwell's appeal, we proceed to his constitutional argument.

## A.

First, Maxwell contends that the uncharged images and evidence concerning his Internet activity should not have been admitted into evidence.  We review a district court's evidentiary rulings for abuse of discretion.  United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003).  "A district court abuses its discretion if it misapplies the law or makes findings of fact that are clearly erroneous."  Ambrosia Coal & Constr. Co. v. Pages Morales, 368 F.3d 1320, 1332 (11th Cir. 2004)

---

[10]  He received sixty-month term for Count I and an additional six-month term for Count II.  The court specified that the terms would run consecutively.

(citations omitted).

The district court found that the uncharged evidence was admissible under Rule 404(b) of the Federal Rules of Evidence. That rule provides,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Without question, the uncharged evidence was probative of Maxwell's knowledge and intent. Therefore, the district court did not abuse its discretion in admitting it.

B.

Maxwell next argues the evidence against him was insufficient to establish that he knew that the charged disks contained images of child pornography. Knowledge is an element of the charged offenses. See 18 U.S.C. § 2252A(a)(5)(B) (establishing criminal liability for any person who "knowingly possesses" material "that contains an image of child pornography").

We review challenges to the sufficiency of the evidence de novo. United States v. Alaboud, 347 F.3d 1293, 1296 (11th Cir. 2003). In so doing, we view the evidence in the light most favorable to the Government, taking all reasonable

14

inferences and credibility determinations reached in the Government's favor. Id.

Because Maxwell chose not to testify, evidence of his knowledge was necessarily circumstantial. The Government presented considerable circumstantial evidence of Maxwell's knowledge. First, Wallace and Agent Dubord indicated that the disks were found in Maxwell's room among Maxwell's possessions. Some of the disks contained labels such as "adult and young" and "pre teens," suggesting that the disks' owner knew they contained files concerning children. Wallace testified that she did not plant the disks in that room, did not use the disks, and did not allow others access to the room. Finally, when she broached the subject of her suspicion to Maxwell, he responded with anger, not surprise. This testimony, coupled with evidence about the location, appearance, and contents of the disks, might have been sufficient to establish Maxwell's knowing possession. But the Government did not stop there.

As described in Part I.B supra, the Government also presented ample evidence of Maxwell's interest in pornography, including "pre teen" pornography. The Government showed that Maxwell joined pornographic Internet groups with names and file directories suggesting an interest in "boys." Maxwell identified himself in at least one of these groups as "boy_lover69_69." The Government also showed that child pornography had been accessed online from Wallace's

15

computer, which Maxwell had used, and that numerous disks containing child pornography, other than the charged disks, were found among his possessions. The jury could have inferred from this evidence that Maxwell had an interest in child pornography and that his possession of the two charged disks was not accidental or unknowing.

Finally, the Government introduced compelling evidence of a phone conversation between Maxwell and his pastor. Just days before the search of Wallace's apartment, Maxwell instructed his pastor to remove evidence, including floppy disks and zip disks in particular, from the scene. A reasonable factfinder could have inferred from this conversation, especially in light of the other evidence, that Maxwell knew that the charged disks contained child pornography.

The jury might have disregarded some of this evidence as unreliable; it might have accepted some of the evidence but decided that it did not support a finding that Maxwell knew about the illicit images. Ultimately, however, the jury was persuaded that Maxwell knowingly possessed child pornography. It does not matter whether we would have reached the same finding based on the same evidence. It only matters that the jury's finding was reasonable. Because it obviously was, Maxwell is not entitled to relief on this ground.

C.

16

Maxwell's third argument is that his convictions rest upon a misconstruction of the term "produced" within the meaning of the statute on which his convictions were based. To prosecute Maxwell successfully under that statute, the Government had to prove beyond a reasonable doubt that Maxwell

> knowingly possess[ed a] book, magazine, periodical, film, videotape, computer disk, or any other material that contain[ed] an image of child pornography [1] that [was] mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or [2] that was produced using materials that [were] mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer.

18 U.S.C. § 2252A(a)(5)(B) (emphasis added). Because the Government did not establish that the pornographic images moved across state lines, its case relied entirely on establishing that the materials that "produced" the disks containing the images moved across state lines.

As explained above, the Government proved that Maxwell knowingly possessed one zip disk and one floppy disk containing images of child pornography. The Government did not establish that Maxwell knowingly possessed cameras or similar devices that were used to capture the original depictions stored on these disks.

Although Maxwell stipulated that the charged disks traveled in interstate commerce before they contained the illegal images, see Part I.B supra, he argues

17

that those disks did not "produce[]" pornographic images.  Disks, Maxwell contends, are nothing more than storage media, and their transportation in interstate commerce is irrelevant to § 2252A(a)(5)(B)'s jurisdictional element.  Maxwell suggests that the materials that "produce[]" pornography in satisfaction of the statute's jurisdictional element only include cameras, film, and similar devices that are used to give "being, form, or shape" to the original images.  Maxwell insists that, because the Government showed only that he stored images, as opposed to producing them, his convictions must be reversed.

We cannot agree.  Maxwell's disingenuous reading of the statute ignores the statute's plain language.  That language directs the word "produced" to media containing illegal images, rather than some abstract conception of images divorced from that media.  As the statute makes clear, possessing a computer disk containing child pornography is no different than possessing a magazine that contains child pornography.  18 U.S.C. § 2252A(a)(5)(B).  In a case charging possession of a pornographic magazine, certainly the Government could establish that the magazine was produced with materials that traveled in interstate commerce by demonstrating that the pornographic images contained therein were photographed by a camera imported from out of the state or country.  But the camera would not be the Government's only recourse.  The Government would

18

show that other materials were also used to create the magazine, including film, paper, a printing press, glue or staples, and quite possibly a computer. If the Government established that any of those materials "ha[d] been mailed, or shipped or transported in interstate or foreign commerce by any means," then the Government would have met the burden required by the text of § 2252A(a)(B)(5).

This understanding of the statute yields a logical consequence: the production of any pornographic material that is prohibited by the statute such that it could not legally travel in interstate commerce constitutes production that satisfies statute's jurisdictional requirement. Whether that material is the original depiction or a copy is irrelevant. Thus, while describing child pornography in written prose or storing it in a paper envelope would not amount to production, duplicating that pornography—in printed or electronic format—would. By the terms of the statute (momentarily setting aside the distinct question of the statute's validity), possessors of child pornography cannot legally use materials that traveled in interstate commerce to copy illicit images and thereby create independent contraband, even if the images were originally photographed in-state with cameras and film manufactured within the state's borders. Nor can they cleanse the taint of an image taken with a camera that traveled in interstate commerce simply by destroying the original film and image, and retaining only

19

copies that were made with equipment manufactured in-state. Ultimately, the contraband item on which the charge is based—be it a photograph or computer disk, an original or duplicate—could not have been "produced" without the camera, film, and the tangible medium on which it was printed, written, displayed, or copied.

If there is a difficult case as to what materials "produced" contraband media containing images of child pornography, it is not Maxwell's case. He was indicted for possessing two disks containing child pornography. This proscribed media was "produced" with numerous materials, including a camera, computers disks, and, presumably, a computer. Here, the Government proved by stipulation that the computer disks used to produce the bases for Maxwell's indictment traveled in interstate commerce. As far as the text of the statute is concerned, then, the Government met its burden. See, e.g., United States v. Angle, 234 F.3d 326, 341 (7th Cir. 2000) ("We believe . . . that computerized visual depictions (i.e., computer graphic files) are 'produced' when computer equipment, including computer diskettes, are used to copy the depictions onto the diskettes that have traveled in interstate commerce.").[11]

---

[11] This decision and many others we discuss have addressed statutes similar to the one at issue, most prominently including 18 U.S.C. § 2252(a)(4)(B). That statute provides,

20

D.

Maxwell's final and most forceful argument is that Congress could not have enacted § 2252A such that it would apply here without exceeding the scope of its legislative authority. For that reason, Maxwell argues, § 2252A is unconstitutional as it has been applied in his particular case.[12]

We review district court conclusions as to the constitutionality of a challenged statute de novo.[13] See, e.g., United States v. Panfil, 338 F.3d 1299,

---

> Any person who . . . knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if—
> (i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
> (ii) such visual depiction is of such conduct;
> shall be punished as provided in subsection (b) of this section.

Although this statute contains different language in part, the terms of its jurisdictional requirement are identical to those of § 2252A, the statute under which Maxwell was convicted.

[12] We do not reach the question of whether § 2252A is facially invalid. Although Maxwell attacked the statute on its face in the district court, his argument on appeal is confined to an as-applied challenge.

[13] The Government contends that Maxwell failed to preserve this issue for appeal and that we are, therefore, limited to review it for plain error. The Government is wrong. At the close of the evidence, Maxwell made an oral motion under Fed. R. Crim. P. 29(a) for a judgment of acquittal. We agree it is debatable whether he challenged § 2252A's constitutionality at that time. Within seven business days of his convictions, however, Maxwell filed a written renewed motion for judgment of acquittal. See Fed. R. Crim. P. 29(c). In that motion, Maxwell explicitly argued that "18 U.S.C. § 2252A(a)(5)(B) is unconstitutional on its face and as applied to his case, since Congress exceeded its authority under the Commerce Clause by making the intrastate possession of child pornography a federal crime." Thus, there can be no question that the constitutional issue before us—now limited to an as applied challenge—was properly preserved

21

1300 (11th Cir. 2003).

Our discussion of this issue proceeds in three parts. First, we discuss the limited power of Congress as a general matter. Second, we weigh the four considerations the Supreme Court enumerated in United States v. Morrison, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000), for determining the extent of Congress's power to regulate "those activities having a substantial relation to interstate commerce." Id. at 610-12, 120 S. Ct. at 1749-51. In the third part, we conclude our analysis of Maxwell's as-applied challenge.

1.

_____

in the district court.

     The Government, pointing to our decision in United States v. Viscome, 144 F.3d 1365, 1370 (11th Cir. 1998), invites us to hold that Maxwell waived this argument because he raised it for the first time after the jury returned its verdict. Even if we found that the argument was not presented in the preconviction motion for judgment of acquittal, we could reach no such holding. In Viscome, appellant Gentile assailed the constitutionality of the statute under which he was charged for the very first time after he was found guilty. Gentile's motion containing this argument was untimely. Id. at 1370. Maxwell's written, renewed motion was not. Rule 29(c) permits defendants to file such motions "within 7 days after a guilty verdict." Fed. R. Crim. P. 49(d) specifies that papers filed in criminal cases must be "filed in a manner provided for in a civil action." In turn, Fed. R. Civ. P. 6(a) provides that weekends and legal holidays are excluded from the computation of filing deadlines of less than 11days. Thus, Maxwell had seven business days to file his renewed motion. The jury returned guilty verdicts against him on May 7, 2003. Maxwell filed his motion on May 16, exactly seven business days later. The Government's response to Maxwell's renewed motion made no intimation that the argument was waived. The district court also correctly assumed that the constitutional argument was properly before it. For that reason, the court addressed the issue squarely on the merits and explicitly found that "18 U.S.C. § 2252A(a)(5)(B) is constitutional on its face and as applied to Defendant Maxwell."

     Since Maxwell raised his argument on time, Viscome is inapposite. His constitutional challenge was preserved for this appeal, and we must review it de novo.

22

"Th[e] [federal] government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it . . . is now universally admitted." United States v. Lopez, 514 U.S. 549, 566, 115 S. Ct. 1624, 1633 (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 405, 4 L. Ed. 579 (1819)). Accordingly, Congress can legislate only within the ambit of the specific powers the Constitution confers on it. The regulation of criminal activity in particular has long been regarded as a role reserved primarily to the states. See, e.g., Morrison, 529 U.S. at 618, 120 S. Ct. at 1754 ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."); id. at 619 n.8, 120 S. Ct. at 1754 n.8 ("[T]he principle that the Constitution created a Federal Government of limited powers, while reserving a generalized police power to the States, is deeply ingrained in our constitutional history." (original alterations and quotation marks omitted)). Accordingly, "[u]nder our federal system the administration of criminal justice rests with the states except as Congress, acting within the scope of [its] delegated powers, has created offenses against the United States." Screws v. United States, 325 U.S. 91, 109, 65 S. Ct. 1031, 1039, 89 L. Ed. 1495 (1945) (plurality opinion).

Through the Child Pornography Prevention Act of 1996, Pub. L. No. 104-

208, § 121, 110 Stat. 3009-26 (1996) (codified as amended in scattered sections of 18 U.S.C. ch. 110), and subsequent amendments, Congress has crafted an offense against the United States for the possession of child pornography, including such pornography that originated within a given state and remained there.  Maxwell was convicted of this offense as it is codified in 18 U.S.C. § 2252A(a)(5)(B).

In this case, the Government established that Maxwell knowingly possessed child pornography in Florida.  That pornography was saved on computer disks that had traveled from out-of-state before they contained illegal images.  The Government proved nothing more.  Apart from the origin of the disks (before they had been committed to nefarious purposes), Maxwell's case involved no apparent connection to activity beyond Florida.  Yet, the Government contends that the power to enforce § 2252A against Maxwell stems from the authority provided to Congress by the Constitution's Commerce Clause.  Pursuant to that clause, Congress has authority "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.

Time has borne out that the text of the Commerce Clause is no model of clarity.  Consequently, the Supreme Court has struggled to define its boundaries. Since the early 1800s, the Court has emphasized that the power to regulate commerce is not a blank check:

> Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more States than one. The phrase is not one which would probably have been selected to indicate the completely interior traffic of a State, because it is not an apt phrase for that purpose; and the enumeration of the particular classes of commerce, to which the power was to be extended, would not have been made, had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State.

Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 194-95, 6 L. Ed. 23 (1824). In recent years, the Supreme Court has synthesized its voluminous Commerce Clause precedent and determined that the Clause authorizes Congress to regulate "three broad categories of activity":

> (1) "the use of the channels of interstate commerce";

> (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and

> (3) "those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce."

Lopez, 514 U.S. at 558-59, 115 S. Ct. at 1629-30 (citations omitted). As the Supreme Court made clear in Lopez, Congress may regulate any channels or instrumentalities of interstate commerce. It may also regulate any person or thing in interstate commerce.

25

Its authority under the commerce clause is more limited, however, with respect to other subjects and activities, such as activities conducted entirely within a state's borders. Although Congress can undoubtedly regulate certain intrastate activity, its power extends over intrastate activity only if that activity bears a "substantial relation to interstate commerce," or as the Court clarified, if it "substantially affect[s] interstate commerce." See id. at 559, 115 S. Ct. at 1630 ("Within this final category, admittedly, our case law has not been clear whether an activity must 'affect' or 'substantially affect' interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause. . . . We conclude . . . that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce."); United States v. Ballinger, 312 F.3d 1264, 1270 (11th Cir. 2002), vacated by 369 F.3d 1238 (11th Cir. 2004) (awaiting rehearing en banc) ("Whereas Congress may regulate any instrumentality or channel of interstate commerce, the Constitution permits Congress to regulate only those intrastate activities which have a substantial effect on interstate commerce, and such regulation of purely intrastate activity reaches the outer limits of Congress' commerce power.").[14] Stated bluntly, wholly

---

[14] We cite Ballinger on the strength of its reasoning only. Because the decision has been vacated and will be reheard by our full court, it is not the law of this circuit.

intrastate activities that have a only minimal or insubstantial effect on interstate commerce are not proper subjects for federal regulation, at least not through the power bestowed by the Commerce Clause.

2.

In this case, the challenged statute does not govern the "channels of interstate commerce," and the Government did not establish that the proscribed images were "things in interstate commerce." Lopez, 514 U.S. at 558, 115 S. Ct. at 1629. Rather the Government has prosecuted Maxwell for intrastate possession of child pornography and relies entirely for its convictions on the fact that the disks on which the pornography was copied traveled in interstate commerce before they contained the images. Therefore, if Congress has proscribed Maxwell's conduct pursuant to a "power[] granted to it," id. at 566, 115 S. Ct. at 1633 (quoting McCulloch, 17 U.S. (4 Wheat.) at 405), it must be because the intrastate possession child pornography falls within Lopez's third category of activities that "substantially affect interstate commerce." Cf. United States v. Adams, 343 F.3d 1024, 1028 (9th Cir. 2003) ("Of course, the possession of child pornography [under § 2252] concerns neither the channels nor the instrumentalities of interstate commerce. It follows that the possession of child pornography must 'substantially affect interstate commerce' in order for Congress to regulate it under the

Commerce Clause."); United States v. Holston, 343 F.3d 83, 88 (2d Cir. 2003)

(holding that assessing the constitutionality of a related statute, 18 U.S.C.

§ 2251(a), "requires us to determine whether, in light of the Morrison factors, the

statute regulates an activity that substantially affects' interstate commerce");

United States v. Corp, 236 F.3d 325, 326 (6th Cir. 2001) (sustaining an as-applied

challenge to § 2252 after applying only the test for Lopez's third category of

Commerce Clause regulation); United States v. Rodia, 194 F.3d 465, 474 n.3 (3d

Cir. 1999) ("[W]e will consider the [18 U.S.C. § 2252(a)(4)(B)] only under

[Lopez's] category (iii), referring to the relevant inquiry in this case whether it was

reasonable for Congress to believe that the behavior regulated substantially affects

interstate commerce.").

The Supreme Court has articulated four considerations for determining

whether an activity "substantially affects" interstate commerce such that it can be

validly regulated through Commerce Clause legislation:

> 1) whether the statute in question regulates commerce "or any sort of
> economic enterprise"; 2) whether the statute contains any "express
> jurisdictional element which might limit its reach to a discrete set" of
> cases; 3) whether the statute or its legislative history contains
> "express congressional findings" that the regulated activity affects
> interstate commerce; and 4) whether the link between the regulated
> activity and a substantial effect on interstate commerce is
> "attenuated."

28

United States v. McCoy, 323 F.3d 1114, 1119 (9th Cir. 2003) (quoting Morrison,

529 U.S. at 610-612, 120 S. Ct. at 1750-51).

We analyze § 2252A's validity as applied to Maxwell's specific case in

light of these four considerations, which we have reordered for convenience of

discussion. The statute is constitutional in its application to Maxwell if "a rational

basis existed for concluding that" the intrastate possession of child pornography

produced with materials that traveled in interstate commerce "sufficiently affect[s]

interstate commerce." Lopez, 514 U.S. at 557, 115 S. Ct. at 1629.

a.

Turning to Morrison's first consideration, we discern nothing commercial or

economic about the possession of child pornography, even if that pornography is

saved on computer disks that were imported from out-of-state. The act of

possession alone—the only act for which Maxwell was charged—entails no

transactions, no consumption of goods or services, and no necessary resort to the

marketplace.[15]

Maxwell's conduct can be sharply distinguished from the activity the

Supreme Court found subject to Commerce Clause regulation in Wickard v.

---

[15] We make no judgment today as to whether the distinct acts of producing, buying, selling, trading, warehousing, distributing, or marketing child pornography constitute economic or commercial activity.

29

<u>Filburn</u>, 317 U.S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942). In <u>Wickard</u>, an Ohio farmer challenged Congress's power to enact a 1941 amendment to the Agricultural Adjustment Act of 1938. <u>Id.</u> at 113, 63 S. Ct. at 83. As amended, the act assessed a "marketing penalty" against the farmer because he grew more wheat than the amount permitted by the act's marketing quota. <u>Id.</u> This quota "not only embrace[d] all that may be sold without penalty but also what may consumed on the premises" of a given farm. <u>Id.</u> at 119, 63 S. Ct. at 86. The farmer sought a declaration that the act's quota provisions were unconstitutional as applied to him. <u>Id.</u> at 113-14, 63 S. Ct. at 83. He argued that the production and consumption of wheat are "beyond the reach of Congressional power under the Commerce Clause, since they are local in character and their effects upon interstate commerce are at most 'indirect.'" <u>Id.</u> at 119, 63 S. Ct. at 86. The Supreme Court disagreed. In reaching its decision, the Court explained,

> The general scheme of the Agricultural Adjustment Act of 1938 as related to wheat is to control the volume moving in interstate and foreign commerce in order to avoid surpluses and shortages and the consequent abnormally low or high wheat prices and obstructions to commerce.

<u>Id.</u> at 115, 63 S. Ct. at 84. Thus, the challenged act constituted a civil scheme directed at controlling the cost and flow of rival goods in the marketplace. The Court's holding relied heavily on the statute's economic purpose and Congress's

long-recognized authority to enact price regulations that affect the national market:

> It is well established by decisions of this Court that the power to regulate commerce includes the power to regulate the prices at which commodities in that commerce are dealt in and practices affecting such prices. One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market.

Id. at 128, 63 S. Ct. at 90-91 (footnote omitted). The Court concluded that even the growth and consumption of wheat locally, if left unregulated, "would have a substantial effect in defeating and obstructing its purpose to stimulate trade therein at increased prices." Id. at 129, 63 S. Ct. at 91.

The regulation at issue in Maxwell's case, by contrast, has no clear economic purpose. It makes no effort to control national trade by regulating intrastate activity. Instead, it attempts to regulate primary conduct directly, even within state borders. Unlike wheat, pornography is a nonrival good. Maxwell is charged with possessing it, and possessing pornography does not result in its consumption such that the overall supply of pornography in the market is reduced. In any event, Congress is clearly not concerned with the supply of child pornography for the purpose of avoiding surpluses and shortages or for the purpose of stimulating its trade at increased prices.

Nor does it seem that § 2252A represents a federal effort to reduce the trafficking of cameras, computers, staples, blank paper, film, or disks in interstate commerce. We are aware of no related regulation that prohibits the movement of these items when they are not committed to the purpose of producing child pornography. Congress's express findings in the Child Pornography Prevention Act of 1996[16] reveal no hint that Congress was concerned about the materials used to produce pornography or how those materials would impact interstate commerce. The statute provides no variation in punishment (or any other distinction for that matter) for pornography produced with very few materials transported in interstate commerce and pornography produced with many such materials. Moreover, while the statute is constructed such that each item of child pornography a defendant possesses can serve as the basis for a separate conviction, it does not permit multiple convictions based on possession of a single item containing child pornography simply because that item was produced with numerous materials that traveled in interstate commerce.

These circumstances persuade us that Congress's reference in this statute to production materials smacks of pretext; the statute's true and core purpose is to criminalize the possession of child pornography. Thus, we conclude that regulated

_____

[16] We discuss these findings and related findings in greater detail in Part II.D.4, infra.

32

intrastate activity in this case is more similar by far to the brand of intrastate criminal conduct that is a proper subject for state regulation alone than it is to the sort of economic activity addressed in Wickard. Cf. Morrison, 529 U.S. at 618, 120 S. Ct. at 1754 ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States.").

"[A] fair reading of Lopez shows that the noneconomic, criminal nature of the conduct at issue was central to [the Court's] decision in that case." Id. at 610, 120 S. Ct. at 1750. Here, the noneconomic, criminal nature of Maxwell's conduct is central to our decision.

b.

Morrison and Lopez, also considered whether the regulated activity's substantial effect on interstate commerce was attenuated. The Court expressed reluctance to consider the long reaching, indirect effects of criminal acts on interstate commerce when assessing the scope of Congress's power under the Commerce Clause. After all, if we were to weigh the "but-for causal chain" from the occurrence of crime, traced to "every attenuated effect on interstate commerce," then "Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority." See

33

Morrison, 529 U.S. at 615, 120 S. Ct. at 1752.  The Court characterized this extended-causation approach as "unworkable if we are to maintain the Constitution's enumeration of powers."  Id.

If Maxwell's conduct has had any effect on interstate commerce, that effect is attenuated to say the least.  In the first place, we reiterate that there is nothing inherently commercial or economic about the mere possession of pornographic images.  We also reemphasize the evident fact that the statute's jurisdictional element is directed at overcoming the legal hurdle of obtaining federal jurisdiction, rather than an aspect of the primary subject matter Congress wishes to control.  This is not regulation of conduct to achieve price regulation or other economic ends; it is regulation of primary conduct, aimed at preventing Americans from engaging in certain activity under any circumstances.  This circumstance alone necessarily attenuates the relationship between regulated conduct and interstate commerce to some degree.  After all, § 2252A's own terms suggest that the very idea of interstate commerce is at least once removed from the regulated activity with which statute is truly concerned, i.e., the possession of child pornography.

The full extent to which the relationship is attenuated, however, becomes apparent only after looking, as we must, to Maxwell's specific conduct.  As far

34

interstate commerce is concerned, Maxwell has done nothing more than possess two disks that traveled from out-of-state. While possessing materials of production might conceivably have a direct impact on interstate commerce in certain circumstances, Maxwell's convictions present no such case. The causal chain necessary to link his activity with any substantial impact on interstate commerce might be long enough to reach the outer limits of the solar system.

The findings Congress announced with its initial enactment of § 2252A suggest in relevant part, first, that

> the existence of and traffic in child pornographic images . . . inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials . . . [and, second, that] prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children.

Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121, 110 Stat. 3009-27 (1996). Whether this explanation of how possessing child pornography can substantially affect interstate commerce is too attenuated as a general matter, we need not say. It is sufficient to remark that, on the facts of this case, there is simply no record evidence to suggest that Maxwell was a potential child molester

35

or that his conduct would likely increase the creation and distribution of child pornography elsewhere, much less to the extent that such creation and distribution would have a substantial effect on interstate commerce. The record is also devoid of evidence that Maxwell's possession of pornography would encourage others to possess such material in any direct or substantial manner.

Other circuits have concluded that the intrastate possession of child pornography has a direct impact on the national market for child pornography by looking beyond the isolated conduct of the defendant and considering the aggregate effect of such possession by others throughout the country.[17]

We believe this aggregate approach cannot be applied to intrastate criminal activity of a noneconomic nature. Congress wields the power to regulate <u>inter</u>state child pornography, not because such pornography has a substantial effect on

---

[17] <u>See, e.g.</u>, <u>Holston</u>, 343 F.3d at 90 ("Since no one would doubt Congress's ability to regulate a national market in child pornography, the question becomes whether Congress could rationally have determined that it must reach local, intrastate conduct in order to effectively regulate a national interstate market. . . . [W]e conclude that Congress, in an attempt to halt interstate trafficking, can prohibit local production that feeds the national market and stimulates demand, as this production substantially affects interstate commerce. (citations and quotation marks omitted)); <u>United States v. Kallestad</u>, 236 F.3d 225, 230 (5th Cir. 2000) ("No one questions Congress's authority to regulate [the interstate market in child pornography] directly. . . . Applying the commerce power, read through the Necessary and Proper Clause, Congress can reach purely local possession if it rationally determines that doing so is necessary to effectively regulate the national market."); <u>Angle</u>, 234 F.3d at 338 ("[B]ecause § 2252(a)(4)(B) prohibits intrastate activity that is substantially related to the closely regulated interstate market of child pornography, we conclude that the statute is a valid exercise of Congress's Commerce Clause power.").

interstate commerce in the aggregate, but because such pornography is a "thing[]

in interstate commerce." Lopez, 514 U.S. at 558, 115 S. Ct. at 1629. A substantial

effect need not be established for this sort of regulation, so the issue of

aggregation is irrelevant. The opposite is true in the intrastate context.

Aggregation was appropriate in Wickard, another case involving intrastate

activity, because of the economic and commercial nature of the activity regulated.

See Morrison, 529 U.S. at 611 n.4, 120 S. Ct. at 1750 n.4 ("In every case where we

have sustained federal regulation under the aggregation principle in Wickard v.

Filburn . . . the regulated activity was of an apparent commercial character."). But

the Supreme Court has since remarked that "Wickard . . . is perhaps the most far

reaching example of Commerce Clause authority over intrastate activity." Lopez,

514 U.S. at 560, 115 S. Ct. at 1630. In Lopez, the Court contrasted the

noneconomic nature of the Gun-Free School Zones Act of 1990 to the economic

nature of the legislation at issue in Wickard:

> [The Gun-Free School Zones Act] is a criminal statute that by its
> terms has nothing to do with "commerce" or any sort of economic
> enterprise, however broadly one might define those terms. [It] is not
> an essential part of a larger regulation of economic activity, in which
> the regulatory scheme could be undercut unless the intrastate activity
> were regulated. It cannot, therefore, be sustained under our cases
> upholding regulations of activities that arise out of or are connected
> with a commercial transaction, which viewed in the aggregate,
> substantially affects interstate commerce.

37

Id. at 561, 115 S. Ct. at 1630-31. Although the Supreme Court has not gone so far as to adopt "a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases," it has emphasized that "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." Morrison, 529 U.S. at 613, 120 S. Ct. at 1751; cf. Ballinger, 312 F.3d at 1270 ("The Constitution permits . . . aggregation of effects to justify congressional regulation of purely intrastate economic activity when the absence of such regulation would undercut a larger regulatory scheme affecting interstate commerce. No such aggregation of local effects is constitutionally permissible in reviewing congressional regulation of intrastate, non-economic activity." (citation omitted)); McCoy, 323 F.3d at 1122 & n.17 (adopting the reasoning in Ballinger).

We have no intention of breaking new ground here. As the Supreme Court has warned, applying an aggregation approach to noneconomic, criminal activity when assessing its impact on interstate commerce would effect an interpretation of the Commerce Clause that essentially vests general police powers with the federal government. The aggregation principle, the Court reasoned,

> will not limit Congress to regulating violence[18] but may, as we suggested in <u>Lopez</u>, be applied equally as well to family law and other areas of traditional state regulation since the aggregate effect of marriage, divorce, and childrearing on the national economy is undoubtedly significant.

<u>Morrison</u>, 529 U.S. at 615-16, 120 S. Ct. at 1753.

As a practical matter, we note further that if the commercial import of general categories of noneconomic, criminal activities could be measured in the aggregate, jurisdictional hooks would be rendered irrelevant. Because the categorical activity of intrastate pornography would be invariably deemed to have a substantial economic effect on interstate commerce, Congress would not be constrained to proscribe its possession to cases in which the materials used to produce it were transported in interstate commerce. Thus, the misguided aggregation approach suggests that jurisdictional elements in all of Congress's Commerce Clause enactments amount to nothing more than superfluous hurdles to federal law enforcement.

Finally, we reiterate the risk Justice Thomas noted in his concurring opinion in <u>Lopez</u> that the aggregation approach could come packaged with an unwanted legislative byproduct. Permitting the validity of congressional action to be tested

---

[18] Although the <u>Morrison</u> majority repeatedly voiced doubts about the ability of Congress to regulated noneconomic, "violent" crimes, we perceive no reason why its rationale would not extend with full force to equally noneconomic crimes of a nonviolent nature.

by the aggregate impact of the regulated activity encourages Congress not to use restraint in exercising its tremendous power, but instead to paint with a fatter regulatory brush. "[O]ne always can draw the circle broadly enough to cover an activity that, when taken in isolation, would not have substantial effects on commerce." Lopez, 514 U.S. at 600, 115 S. Ct. at 1650 (Thomas, J., concurring). Thus, if we adopted an aggregate methodology for assessing the effect of noneconomic, criminal activity on interstate commerce, and we then determined that the effect of child pornography was still insufficient, Congress could accomplish its aims by outlawing all pornography.[19]

By finding that Congress's power to regulate intrastate possession follows naturally from its power to regulate interstate possession, our sister circuits have taken two leaps. They first assume that intrastate possession affects the interstate market for child pornography. They then assume that this effect on the interstate market yields a substantial impact on interstate commerce. Whether or not a substantial effect on the interstate market for child pornography necessarily translates into a substantial effect on interstate commerce, we detect a flaw in their application of leap one. The effect on the interstate market—and ultimately

---

[19] We acknowledge that this particular congressional response might be met with First Amendment hurdles, but we set that issue aside for the moment. Other activities that could be spiraled into expanding rings of regulation might not enjoy protection from the Bill of Rights.

interstate commerce—must be measured in relation to the isolated conduct at issue, rather than as a nationwide aggregate, because the intrastate possession of child pornography is a criminal, noneconomic activity.

One court has advanced an "addiction theory" as to why the intrastate possession of child pornography has a substantial impact on interstate commerce. Specifically, the Third Circuit, on reviewing the legislative history of § 2252, postulated that a person possessing intrastate child pornography could develop an increasing appetite for more such materials that eventually affects the interstate market substantially. See Rodia, 194 F.3d at 478-79. This theory, which was devised before Morrison came down, provides too attenuated a link to interstate commerce and would require us "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." Lopez, 514 U.S. at 567, 115 S. Ct. at 1634.

In sum, we review Maxwell's conduct independently and determine that its link to a substantial effect on interstate commerce, if any, is exceedingly attenuated.

c.

In Morrison and Lopez, the Supreme Court also considered the absence of a

41

"jurisdictional element that would ensure, through case-by-case inquiry, that the" charged conduct "has the requisite nexus with interstate commerce." Lopez, 514 U.S. at 549, 115 S. Ct. at 1625. The Court noted that "[s]uch a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce." Morrison, 529 U.S. at 612, 120 S. Ct. at 1751.

Of course not just any additional element of a crime can "ensure, through case-by-case" analysis that a given activity is constitutionally subject to regulation through the Commerce Clause, even if the element is cast in jurisdictional language. We decline the invitation to permit Congress to achieve power beyond its constitutional reach simply by uttering pretextual incantations evoking the phantasm of commerce. Obviously, Congress could not federalize the crime of murder by inserting statutory elements that are irrelevant to interstate commerce, such as obliging the prosecution to show that the defendant has blue eyes. It follows that Congress cannot guarantee the proper the use of its authority by creating jurisdictional hooks that relate to interstate commerce in some way but fail in all cases to confine the scope of its regulation to Constitutional boundaries. This fact is obvious to the point of tautology: if a statute's jurisdictional element is not sufficiently restrictive to cabin the statute's reach to permissible applications, then the element is no guarantee of constitutional application. See

42

Kallestad, 236 F.3d at 229 ("Where the relationship between the interstate and local activity is attenuated, a jurisdictional hook alone cannot justify aggregating effects upon interstate commerce to find Congressional power under the Commerce Clause."); Rodia, 194 F.3d at 473 ("A jurisdictional element is only sufficient to ensure a statute's constitutionality when the element either limits the regulation to interstate activity or ensures that the intrastate activity to be regulated falls within one of the three categories of congressional power."). Were the law otherwise, Congress could federalize the crime of murder by inserting a statutory element that requires the prosecution to prove that the defendant ate a cheeseburger that traveled in interstate commerce.

This case requires us to consider only the second of two jurisdictional hooks contained in § 2252A(a)(5)(B).[20] This hook enables the Government to obtain a federal conviction for the possession of child pornography upon a showing that the charged pornography was "produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer." 18 U.S.C. § 2252A(a)(5)(B). The statute was applied to convict

---

[20] We do not pass on the sufficiency of the statute's alternative jurisdictional showing, namely that the charged pornographic material itself "has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer." 18 U.S.C. § 2252A(a)(5)(B).

Maxwell for purely intrastate activity that could only fall within the third category of activities subject to Commerce Clause legislation. Consequently, the statute's jurisdictional hook only guarantees that Congress acted within the confines of its power in all applications of the statute if the hook requires the prosecution to prove, in substance, that Maxwell's criminal possession "<u>substantially</u> affect[s] interstate commerce." <u>Lopez</u>, 514 U.S. at 559, 115 S. Ct. at 1630 (emphasis added). We hold that the terms of the jurisdictional hook at issue fall short of demanding that showing.

As the Ninth Circuit reasoned with regard to an identical jurisdictional element in 18 U.S.C. § 2252(a)(4)(B), "[i]t not only fails to limit the reach of the statute to any category or categories of cases that have a particular effect on interstate commerce, but, to the contrary, it encompasses virtually <u>every</u> case imaginable, so long as any modern-day photographic equipment or material has been used." <u>McCoy</u>, 323 F.3d at 1124; <u>see also</u> <u>Rodia</u>, 194 F.3d at 473 ("As a practical matter, [§ 2252(a)(4)(B)'s] limiting jurisdictional factor is almost useless here, since all but the most self-sufficient child pornographers will rely on film, cameras, or chemicals that traveled in interstate commerce and will therefore fall within the sweep of the statute."). We have struggled to conceive of a possessor of child pornography who would not be subject to federal prosecution if Maxwell

44

is. We could only imagine a possessor inhabiting an autonomous commune located in a single state. This hypothetical commune has developed its own technology, and has given form to that technology entirely from materials produced within its borders. That commune makes its own paper from its own pulp and has ingeniously constructed cameras from indigenous ingredients alone. Those same ingredients are used to make and develop bricolage film into pictures without assistance from the outside world. Unfortunately, even here in this industrious and self-sufficient society we encounter the cancer of exploitation. A member of the commune takes pornographic pictures of a child-resident. That pornographer, we conclude, would arguably be the only defendant beyond the reach of the federal government by the terms of the statute.[21]

In our collective experience, we know of no such communes. We strongly suspect that it would be impossible in today's world to develop a picture without utilizing a material, somewhere down the line, that originated beyond the borders of the state in which the picture was taken. We, thus, take heed of the Supreme Court's warning

---

[21] On the reasoning of some of our sister circuits, the possession of pornography, even when wholly intrastate, inherently affects interstate commerce. On this view (which we do not share), it seems that the origin of production materials is constitutionally irrelevant, and Congress thus has authority to regulate the intrastate possession of pornography more closely than it already has by the terms of § 2252A. Even the pornographer on the commune would be within federal reach if Congress should desire to reach so far.

that the scope of the interstate commerce power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government."

Lopez, 514 U.S. at 557, 115 S. Ct. at 1628-29 (quoting NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S. Ct. 615, 624, 81 L. Ed. 893 (1937)).

We need not—and do not—hold today that there is absolutely no set of facts on which the intrastate possession child pornography could have a substantial impact on interstate commerce. Nevertheless, we fail to comprehend, for instance, how the possession of an illegal magazine might substantially affect interstate commerce because it contains a foreign staple. Because we have no doubt that there are some instances in which a defendant can possess child pornography created with materials that traveled from out-of-state without substantially affecting interstate commerce, we conclude that § 2252A's jurisdictional hook is patently insufficient to ensure the statute's constitutional application in a case such as Maxwell's.

d.

Finally, Morrison directs us to consider whether § 2252A's legislative history contains express congressional findings regarding the effects on interstate

46

commerce of possessing child pornography.  The Court specified, however, that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation."  Morrison, 529 U.S. at 614, 120 S. Ct. at 1752.  We are not obliged to conclude that a regulated activity substantially affects interstate commerce simply because Congress crafted findings stating that it does.  See id.

> [W]hether particular operations affect interstate commerce
> sufficiently to come under the constitutional power of Congress to
> regulate them is ultimately a judicial rather than a legislative
> question, and can be settled finally only by this Court.

Lopez, 514 U.S. at 557 n.2, 115 S. Ct. at 1629 n.2 (quoting Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 273, 85 S. Ct. 348, 366, 13 L. Ed. 2d 258 (1964) (Black, J., concurring)).  In Morrison, in fact, the Supreme Court was unpersuaded by Congress's findings and noted that those findings relied "heavily on a method of reasoning we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers."  Morrison, 529 U.S. at 615, 120 S. Ct. at 1752.

Congress enacted the original version of § 2252A under the Child Pornography Prevention Act of 1996.  Even this early version contained the jurisdictional hook at issue in this case.  With the initial enactment, Congress

made numerous findings, which we reproduce in the margin.[22]  As explained

_____

[22]  Congress finds that—

(1) the use of children in the production of sexually explicit material, including photographs, films, videos, computer images, and other visual depictions, is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved;

(2) where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years;

(3) child pornography is often used as part of a method of seducing other children into sexual activity; a child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children "having fun" participating in such activity;

(4) child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children; such use of child pornography can desensitize the viewer to the pathology of sexual abuse or exploitation of children, so that it can become acceptable to and even preferred by the viewer;

(5) new photographic and computer imaging technologies make it possible to produce by electronic, mechanical, or other means, visual depictions of what appear to be children engaging in sexually explicit conduct that are virtually indistinguishable to the unsuspecting viewer from unretouched photographic images of actual children engaging in sexually explicit conduct;

(6) computers and computer imaging technology can be used to--

(A) alter sexually explicit photographs, films, and videos in such a way as to make it virtually impossible for unsuspecting viewers to identify individuals, or to determine if the offending material was produced using children;

(B) produce visual depictions of child sexual activity designed to satisfy the preferences of individual child molesters, pedophiles, and pornography collectors; and

(C) alter innocent pictures of children to create visual depictions of those children engaging in sexual conduct;

(7) the creation or distribution of child pornography which includes an image of a recognizable minor invades the child's privacy and reputational interests, since images that are created showing a child's face or other identifiable feature on a body engaging in sexually explicit conduct can haunt the minor for years to come;

(8) the effect of visual depictions of child sexual activity on a child molester or pedophile using that material to stimulate or whet his own sexual appetites, or on a child where the material is being used as a means of seducing or breaking down the child's inhibitions to sexual abuse or exploitation, is the same whether the child pornography consists of photographic depictions of actual children or visual depictions produced wholly or in part by electronic, mechanical, or other means, including by computer, which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children;

(9) the danger to children who are seduced and molested with the aid of child sex pictures is just as great when the child pornographer or child molester uses visual depictions of child sexual

48

in Part II.D.2.b <u>supra</u>, little can be gleaned from these findings about the impact of

child pornography on interstate commerce, and particularly the impact of

possessing child pornography intrastate.  Instead, the vast majority of the findings

support the broader proposition that child pornography (even that which is

generated by computer without actual people) is bad and harmful to children.  We

are prepared to take judicial notice of these points, but they aid us little in

---

activity produced wholly or in part by electronic, mechanical, or other means, including by computer, as when the material consists of unretouched photographic images of actual children engaging in sexually explicit conduct;

(10)(A) the existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children; and

(B) it inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials;

(11)(A) the sexualization and eroticization of minors through any form of child pornographic images has a deleterious effect on all children by encouraging a societal perception of children as sexual objects and leading to further sexual abuse and exploitation of them; and

(B) this sexualization of minors creates an unwholesome environment which affects the psychological, mental and emotional development of children and undermines the efforts of parents and families to encourage the sound mental, moral and emotional development of children;

(12) prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children; and

(13) the elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct, including both photographic images of actual children engaging in such conduct and depictions produced by computer or other means which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children engaging in such conduct.

Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121, 110 Stat. 3009-26-27 (1996).

understanding how a federal prohibition on the intrastate possession of child pornography produced with interstate materials is a proper exercise of the Commerce Clause power.

Since its enactment, the statute has been amended several times. Findings related to the amendments should be viewed with caution because they do not necessarily reflect Congress's intentions at the time the original statute was enacted. See, e.g., United States v. Price, 361 U.S. 304, 313, 80 S. Ct. 326, 332, 4 L. Ed. 2d 334 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."). At any rate, those findings shed little light on the present inquiry. The statute was amended, for example, pursuant to the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act (Protect Act) of 2003, Pub. L. No. 108-21, 117 Stat. 650 (2003). Congress supplied additional findings with those amendments, but they did not address Congress's authority or, more importantly, the effect on interstate commerce of possessing child pornography intrastate.[23]

---

[23] Instead, the new findings were directed almost exclusively at concerns related to the Supreme Court's recent decision in Ashcroft v. Free Speech Coalition, 535 U.S. 234, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002). That case held Congress violated the First Amendment in its efforts to proscribe all virtual child pornography (as contrasted to actual child pornography involving real children), including that which could not be defined as obscene according to Supreme Court precedent. Id. at 256, 122 S. Ct. at 1405 ("In sum, § 2256(8)(B) covers materials beyond the categories recognized in Ferber and Miller, and the reasons the Government offers in support of limiting the freedom of speech have no justification in our precedents or in the law of

Other circuits upholding § 2252 (which contains a jurisdictional hook similar to the one in § 2252A, see supra note 11) against as-applied challenges have seized on legislative findings related to that statute. See, e.g., Kallestad, 236 F.3d at 229. These findings are particularly unreliable for our purposes since they were reached not only at a different time than when § 2252A was enacted, but also reflect Congress's view of a different, albeit related, statutory provision. Cf. Lopez, 514 U.S. at 563, 115 S. Ct. at 1632 ("[I]mportation of previous findings to justify § 922(q) is especially inappropriate here because the prior federal enactments or Congressional findings [do not] speak to the subject matter of section 922(q) or its relationship to interstate commerce. Indeed, section 922(q) plows thoroughly new ground and represents a sharp break with the long-standing pattern of federal firearms legislation." (alteration in original) (quotation marks and citation omitted)). The following finding in particular has been cited by other circuits:

> [C]hild pornography and child prostitution have become highly organized multimillion dollar industries that operate on a nationwide scale[, and] such prostitution and the sale and distribution of such pornographic materials are carried on to a substantial extent through the mails and other instrumentalities of interstate and foreign commerce . . . .

the First Amendment. The provision abridges the freedom to engage in a substantial amount of lawful speech. For this reason, it is overbroad and unconstitutional.").

51

S. Rep. No. 95-438, at 5 (1977), reprinted in 1978 U.S.C.C.A.N. 40, 42-43.[24]

Notably, this finding remarks only on interstate child pornography and teaches nothing about the effects of intrastate child pornography or noncommercial child pornography for that matter. See McCoy, 323 F.3d at 1127. For that reason, the Third Circuit, even in upholding the statute, indicated that it was "troubled by the lack of express Congressional findings about the effect of intrastate possession of child pornography on interstate commerce." Rodia, 194 F.3d at 482. The Ninth Circuit concluded that "[a]t most, the legislative history here tells us that Congress intended to eliminate the interstate commercial child pornography market, and nothing more." McCoy, 323 F.3d at 1127.

Other aspects of § 2252's legislative history reveal some uncertainty about Congress's power to regulate intrastate activity at the time it enacted the statute. The Senate Judiciary Committee, for example, remarked that it was "well aware of the delicate balance that must be maintained between federal and state and local law enforcement efforts to curb criminal behavior. It is quite true that the general responsibility for dealing with criminal activity is normally not a matter of federal

---

[24] Comparable findings are referenced in the Historical and Statutory Notes to 18 U.S.C. § 2251 ("Congressional Findings") (quoting Pub. L. No. 99-500, § 702(1), 100 Stat. 1783-74 (1986); Pub. L. No. 99-591, § 702(1), 100 Stat. 3341-74 (1986); Pub. L. No. 98-292 § 2, 98 Stat. 204 (1984)).

concern." S. Rep. No. 95-438, at 10. Nevertheless, the committee proceeded to express the view that state authorities could not adequately control child pornography on their own. While this comment reveals a congressional motive for regulation, it answers none of the concerns the committee voiced about the delicate balance between federal and state power.

Furthermore, as the Ninth Circuit observed, an appendix to the same Senate report also contained the United States Department of Justice's views about the legislation and suggested that the statute's enactment exceeded Congress's power. McCoy, 323 F.3d at 1128 (citing S. Rep. No. 95-438, at 25-26). Indeed, Assistant Attorney General Patricia Wald bluntly cautioned,

> In the first place, the bill is, in our opinion, jurisdictionally deficient.
> . . . .
> . . . [T]he bill could cover a purely local act of child abuse in which there is, in fact, no filming or photographing and no possible effect on interstate or foreign commerce. The bill, therefore, would reach situations not properly cognizable under the Commerce Clause.

S. Rep. No. 95-438, at 25-26. The Department thus recommended that

> the investigation or prosecution of purely local acts of child abuse should be left to local authorities with federal involvement confined to those instances in which the mails or facilities of interstate commerce are actually used or intended to be used for distribution of the film or photographs in question.

Id. at 26.

It bears repetition that these serious doubts regarded the initial version of § 2252. That version did not even contain the expansive jurisdictional hook at issue in this case (i.e., the hook relating to pornography produced with materials that have been transported in interstate commerce). Furthermore, that statute was first enacted in 1978, roughly seventeen years before the Supreme Court's landmark decision in Lopez.

Recognizing that legislative history is an eclectic stew from which just about any vegetable can be extracted, we find nothing to persuade us that possessing child pornography produced with materials transported in interstate commerce is an activity that has a substantial effect on interstate commerce.

3.

In sum, our analysis of Morrison's four considerations reveals no rational basis for concluding that the conduct for which Maxwell was convicted substantially affects or affected interstate commerce. Maxwell's activity was noneconomic and noncommercial in nature; its connection to interstate commerce was tenuous at best. Section 2252A's jurisdictional element requiring the government to establish that the illegal images were produced by materials that were transported in interstate commerce by no means ensures that the statute will be enforced only with regard to activity that has a substantial impact on interstate

commerce. Lastly, the statute's legislative history provides no meaningful evidence that the intrastate possession of child pornography at issue in this case, although produced with two disks that traveled in interstate commerce, substantially affects interstate commerce. Consequently, § 2252A's application to Maxwell's conduct cannot be sustained as a valid exercise of Commerce Clause authority.

We believe Morrison's framework produces the correct result in this case. It is difficult to imagine an activity more local in character than Maxwell's private possession of images within the confines of a single state (and perhaps, moreover, within a single home). The record shows that the Government did not allege or prove that Maxwell produced the pornography. It did not allege or prove that he purchased the pornography. It did not allege or prove that he traded or distributed the pornography or that he ever harbored any intention of doing so. It did not allege or prove that he consumed the pornography so as to affect its supply in the market. It did not allege or prove that his possession encouraged him or others to seek more pornography so as to affect its demand in the market. It did not even allege or prove that he actually viewed the pornography. As such, it strains reason to conceive of how Maxwell's activity of possession was in any sense "commerce." Moreover, the Government did not allege or prove that Maxwell's

pornography traveled from out-of-state. It did not allege or prove that the pictures were originally photographed out-of-state. In fact, the only testimony concerning the origin of any charged photograph suggests that it was taken in Florida. The Government did not allege or prove that Maxwell obtained the pornography through the use of the Internet, phone lines, or any other channel of interstate commerce or communication. It did not allege or prove that Maxwell took or intended to take the pornography out of the state, for commercial or personal use. As such, it strains reason to conceive of how Maxwell's activity of possession was in any sense "interstate." At the end of the day, the Government rested its entire case on one fact relating to the jurisdictional element: the disks on which the pornography was ultimately copied traveled, when blank, to Florida from someplace outside of Florida. We reject the Government's contention that this fact converts Maxwell's conduct into an activity subject to Commerce Clause regulation.[25]

---

[25] We note in passing that some of our sister circuits have reached a contrary result in comparable cases. Many of these cases were decided before the Supreme Court's decision in Morrison. See, e.g., Rodia, 194 F.3d at 479 (holding "that Congress rationally could have believed that child pornography that did not itself travel in interstate commerce has a substantial effect on interstate commerce, and is thus a valid subject of regulation under the Commerce Clause"). Some entailed factual distinctions that might have had a serious impact on our analysis. See, e.g., Angle, 234 F.3d at 330-31 (Government supported charges of attempted receipt and possession of child pornography, 18 U.S.C. §§ 2252(a)(2), 2252(a)(4)(B), with evidence that defendant ordered pornography from a former commercial distributor via e-mail; Government supported charge of soliciting a minor to engage in sexually prohibited activity, 18

It could be argued that the considerations articulated above, by and large,

_____

U.S.C. § 2422(b), with evidence that defendant had used the telephone and Internet in furtherance of his efforts). Yet others attributed a misplaced reliance to the presence of a jurisdictional hook like the one contained in § 2252A. See, e.g., United States v. Hoggard, 254 F.3d 744, 746 (8th Cir. 2001) (holding that a "jurisdictional nexus" similar to that in § 2252A "is sufficient to place [18 U.S.C. § 2251(b)] beyond constitutional attack"). Ultimately, we find that these decisions are inapplicable or, otherwise, unconvincing.

We are most persuaded by the Ninth Circuit's opinion in McCoy. In that case, the Ninth Circuit determined that 18 U.S.C. § 2252(a)(4)(B), a statute very similar to § 2252A(a)(5)(B), was unconstitutional as applied to a defendant who was convicted for possessing one image of child pornography displaying her and her daughter, side by side, with their genital areas exposed. McCoy, 323 F.3d 1115, 1133. Federal jurisdiction for the defendant's prosecution "was premised upon the place of manufacture of the camera and film used to take the pictures." Id. at 1116. The court concluded

> that § 2252(a)(4)(B)'s application to the simple intrastate possession of a visual depiction (or depictions) that has not been mailed, shipped, or transported interstate and is not intended for interstate distribution or for economic or commercial use, including the exchange of the prohibited material for other prohibited material, cannot be justified under the Commerce Clause.

Id. at 1133; see also Corp, 236 F.3d at 326, 333 (holding that federal jurisdiction to prosecute a defendant for producing child pornography in violation of 18 U.S.C. § 2251(a) could not be based entirely on the fact that the photographic paper on which the pornography was printed was manufactured out-of-state). The district court in this case concluded that McCoy is inapposite because of its factual distinctions. We disagree. McCoy differed from this case in at least two respects. First, the defendant in McCoy was charged with possessing only one illegal image. McCoy, 323 F.3d at 1115. Maxwell was charged with possessing many. Second, the defendant in McCoy clearly produced the image, which depicted her own daughter. The Ninth Circuit found no "reason to believe that she had any interest in acquiring pornographic depictions of other children. There is thus no fungibility element present in cases such as hers." Id. at 1122. By contrast, there is no evidence that Maxwell's prurient interests were confined to particular children; he may well have regarded the images he possessed as fungible with other images. We believe that McCoy is instructive despite these distinctions. Its assessment of the tenuous "connection between the simple intrastate possession of child pornography and interstate commerce" seems applicable even where a defendant possesses numerous, fungible images. Id. at 1123-24 (reasoning that Congress's regulation of local crime on a theory of its aggregate effect on the national economy would invade the police powers reserved to the states). Its skepticism of the statute's jurisdictional hook and legislative history is likewise applicable, at least by analogy. Id. at 1124-29.

57

have nothing to do with the elements of the statute.  After all, § 2252A prohibits possession, not production, not travel, not trade or sale.  This criticism cannot be overlooked.  But neither can the fact that the terms of the Commerce Clause itself and the constitutional limitations on federal power are articulated outside the statute.  Obviously, the validity of the statute's application in this case rests not on the satisfaction of its own requirements; rather, it rests on conformity with the restrictions built into the Constitution and the federalist government the Constitution establishes.  The fact that the Constitution might require showings that a statute does not is no anomaly, but is instead an indispensable ingredient in the recipe for any statute that is facially valid but invalid as applied in particular cases.  If the elements of the crime set forth in § 2252A required showings that were always sufficient to establish Congress's authority for its enactment and application, then every conviction under the statute would be valid (assuming that the statute never invaded overriding rights, such as that of free speech).

Our Nation's Founders were not naive about the risk of an all-encompassing central power, nor, it seems, did they ignore the possibility that the legislature might be tempted to overstep its bounds to legislate ideals favored by its constituencies.  Federalism is no academic shibboleth.  It is neither an inane legalism, nor an anachronous vestige of a bygone colonial era.  The federalist

system places a vital check on the power of the central government to trespass on our freedom. See Morrison, 529 U.S. at 616 n.6, 120 S. Ct. at 1753 n.6 ("[T]he Framers crafted the federal system of Government so that the people's rights would be secured by the division of power."); Lopez, 514 U.S. at 576, 115 S. Ct. at 1638 (Kennedy, J., concurring) ("Though on the surface the idea [of federalism] may seem counterintuitive, it was the insight of the Framers that freedom was enhanced by the creation of two governments, not one."); Atascadero State Hosp. v. Scanlon, 472 U.S. 234, 242, 105 S. Ct. 3142, 3147, 87 L. Ed. 2d 171 (1985) ("The 'constitutionally mandated balance of power' between the States and the Federal Government was adopted by the Framers to ensure the protection of 'our fundamental liberties.'" (quoting Garcia v. San Antonio Metro Transit Auth., 469 U.S. 528, 572, 105 S. Ct. 1005, 1028, 83 L. Ed. 2d 1016 (1985) (Powell, J., dissenting))). Federalism ensures a role for the governments of the states and affords the voting public a more resonant voice in the debate over many legislative issues of principally local concern. We decline today, with no small regret about the outcome in this case, to ignore that design, even in favor of strengthening the hand of federal law enforcement in the salutary aim of eradicating child pornography.

III.

For the foregoing reasons, Maxwell's convictions are

REVERSED.