[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-14326

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 20, 2006
THOMAS K. KAHN
CLERK

D.C. Docket No. 03-00027-CR-T-24-TGW

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES MAXWELL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 20, 2006)

**ON REMAND FROM THE
SUPREME COURT OF THE UNITED STATES**

Before EDMONDSON, Chief Judge, and TJOFLAT, and COX, Circuit Judges.

TJOFLAT, Circuit Judge:

This case is before us on remand from the Supreme Court with instructions to reconsider our decision, 386 F.3d 1042 (11th Cir. 2004), in light of the Court's recent opinion in Gonzalez v. Raich, 545 U.S. __, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005). United States v. Maxwell, 126 S. Ct. 321, 163 L. Ed. 2d 29 (2005) (mem.). Upon reconsideration, we determine that Raich mandates that we reverse our prior decision, in which we held that 18 U.S.C. § 2252A was unconstitutional as applied to the defendant's conduct. Because this determination only affects parts II.D and III of our original opinion, we reinstate the remainder of the opinion and affirm the defendant's conviction. Part I briefly lays out the facts of this case. Part II summarizes the reasoning of our prior opinion. Part III discusses the Supreme Court's decision in Raich and applies it to this case. Part IV briefly concludes.

## I.

Our prior opinion extensively lays out the facts of this case, Maxwell, 386 F.3d at 1045 - 49, so we only provide context here. James Maxwell was convicted of two counts of knowingly possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B),[1] a provision of the Child Pornography Prevention Act of

---

[1] Section 2252A(a)(5)(B) provides, in relevant part:
Any person who . . . knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child

1996 (CPPA), Pub. L. No. 104-208, § 121, 110 Stat. 3009-26 (codified as amended in scattered sections of 18 U.S.C. ch. 110). He had been renting a room in Alberta Wallace's apartment in St. Petersburg, Florida. After growing suspicious that Maxwell was using Wallace's computer to obtain and view child pornography, Wallace contacted the police and permitted them to search her computer and apartment, where they found disks containing numerous images of child pornography. Maxwell, 386 F.3d at 1045. The prosecution entered several pieces of evidence as part of its case in chief, including several of the disks, testimony of law enforcement officers pertaining to the age of persons on the disks, and a phone call Maxwell placed to his pastor – while incarcerated on unrelated charges – regarding the disks at Wallace's apartment. Id. at 1046 - 49. To satisfy the jurisdictional requirement of the statute, the Government offered the following stipulation, which the court read to the jury:

> It is stipulated and agreed between the parties that the computer zip disk that is the basis for Count 1 of the Indictment, and the computer floppy disk that is the basis for Count 2 of the Indictment, were both manufactured outside the State of Florida and have been mailed, shipped or transported in interstate commerce.

---

pornography that has been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer . . . shall be punished . . . .

3

Id. at 1049. In other words, the Government relied upon the "produced using materials that have been mailed, or shipped or transported in interstate . . . commerce" clause of section 2252A(a)(5)(B) to establish jurisdiction in this case. Maxwell put on no defense. Id.

## II.

On appeal, Maxwell claims that § 2252A is unconstitutional as applied to the facts of his case. Our earlier analysis of Maxwell's constitutional challenge began with a summary of the Supreme Court's Commerce Clause jurisprudence to date, noting that Congress may constitutionally regulate three categories of activities:

> (1) the use of the channels of interstate commerce;
> (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and
> (3) those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

Maxwell, 386 F.3d at 1054 -55 (internal quotation marks omitted) (quoting United States v. Lopez, 514 U.S. 549, 558 - 59, 115 S. Ct. 1624, 1629 - 30, 131 L. Ed. 2d 626 (1995) (citations omitted)). Upon concluding that the regulation could be sustained, if at all, only as an exercise of Lopez 3 authority, we proceeded to determine whether intrastate possession of child pornography (produced using

4

materials that have traveled in interstate commerce) could be said to "substantially affect interstate commerce." In so doing, we followed Supreme Court guidance, and analyzed four considerations relevant to assessing whether a given activity "substantially affects" interstate commerce:

> 1) whether the statute in question regulates commerce "or any sort of economic enterprise"; 2) whether the statute contains any "express jurisdictional element which might limit its reach to a discrete set" of cases; 3) whether the statute or its legislative history contains "express congressional findings" that the regulated activity affects interstate commerce; and 4) whether the link between the regulated activity and a substantial effect on interstate commerce is "attenuated."

Maxwell, 386 F.3d at 1056 (quoting United States v. McCoy, 323 F.3d 1114, 1119 (9th Cir. 2003) (quoting United States v. Morrison, 529 U.S. 598 , 610 - 12, 120 S. Ct. 1740, 1750 - 51, 146 L. Ed. 2d 658 (2000))).

In analyzing the first consideration, we found "nothing commercial" about the possession of child pornography – an activity that "entails no transactions, no consumption of goods or services, and no necessary resort to the marketplace." Id. at 1056. We noted that "[t]he regulation at issue in Maxwell's case . . . has no clear economic purpose. It makes no effort to control national trade by regulating intrastate activity. Instead, it attempts to regulate primary conduct directly . . . ." Id. at 1057.

5

Moving to the "attenuated" prong of the Supreme Court's enumerated considerations, we reasoned that the aggregation approach to determining whether an activity's effect on interstate commerce is "attenuated," see Wickard v. Filburn, 317 U.S. 111, 127 - 28, 63 S. Ct. 82, 90, 87 L. Ed. 122 (1942) ("That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial."), is not applicable to "intrastate criminal activity of a noneconomic nature." Maxwell, 386 F.3d at 1059.[2] As such, we determined that any relationship between Maxwell's individual conduct and a substantial effect on interstate commerce was "exceedingly attenuated." Id. at 1061.

We then examined the effect of the statute's jurisdictional element and whether it "'would ensure, through case-by-case inquiry, that the' charged conduct

_____

[2] In making this point, we noted the following:
[I]f the commercial import of general categories of noneconomic, criminal activities could be measured in the aggregate, jurisdictional hooks would be rendered irrelevant. Because the categorical activity of intrastate pornography would be invariably deemed to have a substantial economic effect on interstate commerce, Congress would not be constrained to proscribe its possession to cases in which the materials used to produce it were transported in interstate commerce. Thus, the misguided aggregation approach suggests that jurisdictional elements in all of Congress's Commerce Clause enactments amount to nothing more than superfluous hurdles to federal law enforcement.
Maxwell, 386 F.3d at 1060 - 61. As we note, infra, this concern, we believe, has come to fruition.

'has the requisite nexus with interstate commerce.'" Id. at 1061 (quoting Lopez, 514 U.S. at 549, 115 S. Ct. at 1625). Finding it difficult to imagine any modern-day photograph taken and developed without ever utilizing any material that originated outside of a given state, we concluded that the jurisdictional requirement was "patently insufficient" as a mechanism for confining the statute's reach to constitutionally permissible applications. Id. at 1063.

Finally, we analyzed the fourth of the Morrison/Lopez factors: whether the legislative history contains express findings regarding the effect of the regulated conduct on interstate commerce. We noted that "little can be gleaned from [the legislative] findings about the impact of child pornography on interstate commerce, and particularly the impact of possessing child pornography intrastate. Instead, the vast majority of the findings support the broader proposition that child pornography . . . is bad and harmful to children." Id. at 1065.

Accordingly, we found "no rational basis for concluding that the conduct for which Maxwell was convicted substantially affects or affected interstate commerce. . . . Consequently, § 2252A's application to Maxwell's conduct [could not] be sustained as a valid exercise of Commerce Clause authority." Id. at 1067.

**III.**

Our prior opinion in this case was decided without benefit of the Supreme

7

Court's most recent Commerce Clause holding handed down in <u>Gonzalez v. Raich</u>, 545 U.S. __, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005). Because the Court's reasoning in <u>Raich</u> calls into question much of our earlier analysis, we are now obliged to reverse course.

A.

In <u>Raich</u>, the Court was presented with the question of whether Congress had the authority, pursuant to the Necessary and Proper and Commerce Clauses, U.S. Const. art. I, § 8, cls. 3, 18, to prohibit, via the Controlled Substances Act (CSA), 21 U.S.C. § 801 <u>et seq.</u>, "the local cultivation and use of marijuana in compliance with California law." <u>Raich</u>, 125 S. Ct. at 2199. The Court began its analysis by noting that its "case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." <u>Id.</u> at 2205 (citing <u>Perez v. United States</u>, 402 U.S. 146, 151, 91 S. Ct. 1357, 28 L. Ed. 2d 686 (1971); <u>Wickard</u>, 317 U.S. at 128 - 29, 63 S. Ct. at 87 (2205)); <u>see also id.</u> at 2206 ("In this vein, we have reiterated that when 'a general regulatory statute bears a substantial relation to commerce, the <u>de minimis</u> character of individual instances arising under that statute is of no consequence.'" (emphasis omitted) (quoting <u>Lopez</u>, 514 U.S. at 558, 115 S. Ct. 1624 (quoting <u>Maryland v. Wirtz</u>, 392 U.S. 183, 196 n.27, 88 S.

8

Ct. 2017, 2024 n.27, 20 L. Ed. 2d 1020 (1968)) (internal quotation marks omitted))).

The Court then discussed its opinion in Wickard, which upheld the application of quota regulations, passed pursuant to the Agricultural Adjustment Act of 1938, to petitioner's production of wheat for wholly personal consumption. Our earlier opinion in this case distinguished Wickard by noting that, unlike a regulatory scheme controlling the volume and prices of the national wheat market, "[t]he regulation at issue in Maxwell's case . . . has no clear economic purpose. It makes no effort to control national trade by regulating intrastate activity." Maxwell, 386 F.3d at 1057. The Supreme Court in Raich, however, interpreted its decision in Wickard far more broadly: "Wickard thus establishes that Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." Raich, 125 S. Ct. at 2206. That the market in Raich happened to be an illegal one did not affect the Court's analysis in the least. See id.; id. at 2207 n.29 ("It has long been settled that Congress' power to regulate commerce includes the power to prohibit commerce in a particular commodity."); id. at 2219 (Scalia, J., concurring in the judgment) ("The power to regulate interstate commerce 'extends not only to those

9

regulations which aid, foster and protect the commerce, but embraces those which prohibit it.'" (quoting United States v. Darby, 312 U.S. 100, 113, 61 S. Ct. 451, 456, 85 L. Ed. 609 (1941))).

What the Court found important, and what distinguished Raich from Morrison and Lopez, both of which invalidated statutes as beyond Congress's Commerce Clause authority, was the comprehensiveness of the economic component of the regulation. Unlike Lopez, which assessed the validity of

> a brief, single-subject statute . . . [that] did not regulate any economic activity and did not contain any requirement that the possession of a gun have any connection to past interstate activity or a predictable impact on future commercial activity[,] . . . the CSA . . . [is] a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession of five classes of "controlled substances."

Raich, 125 S. Ct. at 2209 - 10. Moreover, the classification of marijuana as a Schedule I drug,[3] "unlike the discrete prohibition established by the Gun-Free School Zones Act of 1990 [at issue in Lopez], was merely one of many 'essential

---

[3] In Raich, the Court explained that:
Schedule I drugs are categorized as such because of their high potential for abuse, lack of any accepted medical use, and absence of any accepted safety for use in medically supervised treatment. . . . By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration pre-approved research study.
Raich, 125 S. Ct. at 2204.

10

part[s] of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" Id. at 2210 (alteration in original) (quoting Lopez, 514 U.S. at 561, 115 S. Ct. at 1631). Thus, where Congress comprehensively regulates economic activity,[4] it may constitutionally regulate intrastate activity, whether economic or not, so long as the inability to do so would undermine Congress's ability to implement effectively the overlying economic regulatory scheme.

The Court left little room for debate as to the expansiveness of its holding. Not only may Congress regulate "non-commerical" activity pursuant to its "Commerce" Clause authority, but courts have only a limited role in second-guessing whether a "class of [non-commercial] activity . . . undercut[s]" Congress's unquestioned authority to regulate the broader interstate market. With respect to the activity at issue in Raich, the Court noted that Congress need only have "a rational basis for concluding that leaving home-consumed marijuana outside federal control would . . . affect price and market conditions." Id. at 2207 (emphasis added). Moreover, in calculating whether the intrastate activity sought to be regulated "substantially affects" interstate commerce, Congress, contrary to

---

[4] The Court quite broadly defined "economics" as "the production, distribution, and consumption of commodities." Id. at 2211 (quoting Webster's Third New International Dictionary 720 (1966)) (internal quotation marks omitted).

11

our prior determination, is entitled to assess the aggregate effect of the non-commercial activity on the interstate market. See id. at 2208 ("We need not determine whether [wholly intrastate] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." (emphasis added) (quoting Lopez, 514 U.S. at 557, 115 S. Ct. at 1629)). Thus, where Congress has attempted to regulate (or eliminate) an interstate market, Raich grants Congress substantial leeway to regulate purely intrastate activity (whether economic or not) that it deems to have the capability, in the aggregate, of frustrating the broader regulation of interstate economic activity.[5]

---

[5] The Court's opinion leaves some doubt as to whether, in the Commerce Clause context, an as-applied challenge may ever be sustained so long as Congress may constitutionally regulate the broader class of activities of which the intrastate activity is a part:

> [R]espondants ask us to excise individual applications of a concededly valid statutory scheme. In contrast, in both Lopez and Morrison, the parties asserted that a particular statute or provision fell outside Congress' commerce power in its entirety. This distinction is pivotal for we have often reiterated that "[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class."

Id. at 2209 (second alteration in original) (quoting Perez, 402 U.S. at 154, 91 S. Ct. at 1361 (quoting Wirtz, 392 U.S. at 193, 88 S. Ct. at 2022)); see Randy E. Barnett, Foreword: Limiting Raich, 9 Lewis & Clark L. Rev. 743, 745 (2005) ("What of the viability of as-applied challenges after Raich? While making such challenges less likely to prevail, because of its expanded construction of federal power, the Court never denies that such challenges can be brought. Wickard v. Filburn, Heart of Atlanta Motel v. United States, and Katzenbach v. McClung were all as-applied challenges. While Raich now joins this unsuccessful list, in none of these cases did the Court ever deny the availability of such a challenge."(footnotes omitted)). We express no view on this more general issue except to note that, under the current framework, successful as-applied challenges to facially constitutional comprehensive regulatory schemes will be the rare exception.

In assessing whether a rational basis did exist for Congress to conclude that intrastate conduct could substantially affect its ability to regulate interstate commerce, the Court noted that specific congressional findings, while helpful, are not necessary. Id. at 2208. It credited as eminently rational that Congress might be persuaded that "leaving home-consumed marijuana outside federal control would . . . affect price and market conditions." Id. at 2207. More specifically, Congress could rationally be concerned that "the high demand in the interstate market will draw such marijuana into that market . . . frustrat[ing] the federal interest in eliminating commercial transactions in the interstate market in their entirety." Id. Factoring in the additional concerns generated by "the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere," the Court had "no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." Id. at 2209 (emphasis added); see also id. at 2211 ("Prohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." (emphasis added)).

The Court summarized its analysis by concluding: "[T]he case for the

13

exemption comes down to the claim that a locally cultivated product that is used domestically rather than sold on the open market is not subject to federal regulation.  Given the findings in the CSA and the undisputed magnitude of the commercial market for marijuana, our decisions in Wickard v. Filburn and the later cases endorsing its reasoning foreclose that claim."  Id. at 2215.

## B.

We find very little to distinguish constitutionally Maxwell's claim from Raich's.[6]  Indeed, much of the Court's analysis could serve as an opinion in this case by simply replacing marijuana and the CSA with child pornography and the CPPA.  Just as the CSA is "a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession of five classes of 'controlled substances;'" id. at 2210, the CPPA is part of a comprehensive regulatory scheme criminalizing the receipt, distribution, sale, production, possession, solicitation and advertisement of child pornography, see

---

[6] We note at the outset the potential confusion that may arise from the now unclear status of the four Morrison/Lopez factors post-Raich.  Although Justice O'Connor, in dissent, analyzed those factors as a doctrinal framework, see 125 S.Ct. at 2221 - 29 (O'Connor, J., dissenting), the majority's analysis neither systematically scrutinized the four factors nor explained why it did not do so.  We decline to adopt a general theory for when those factors apply and when they do not. It is sufficient for present purposes to note we are not here dealing with a single-subject statute whose single subject is itself non-economic (e.g., possession of a gun in a school zone or gender-motivated violence).  Rather here, as in Raich, appellant challenges a component of a broader regulatory scheme whose subject is decidedly economic.  As such, Raich guides our analysis.

14

18 U.S.C. §§ 2251 - 52A.[7]

Congress has noted that "child pornography . . . ha[s] become [a] highly organized, multimillion dollar industr[y] that operate[s] on a nationwide scale. S. Rep. No. 95-438, at 5 (1977), reprinted in 1978 U.S.C.C.A.N. 40, 42, 1977 WL 9660. This market is "quintessentially economic." Raich, 125 S. Ct. at 2211; see supra note 4. Congress, through its comprehensive regulation, of which 18 U.S.C. § 2252A is a part, has attempted to eliminate the entire market for child pornography, which, as the Court noted in Raich, is just as valid an exercise of Commerce Clause authority as price and volume controls of an otherwise legal market. In enacting, section 2252A, Congress indicated how intrastate possession of child pornography (or any child pornography for that matter) affects the larger market:

> [T]he existence of and traffic in child pornographic images . . .
> inflames the desires of child molesters, pedophiles, and child

---

[7] We recognize that, at least in one respect, the regulatory scheme of which the CPPA is a part is less comprehensive than the CSA: The CSA is a "comprehensive framework for regulating . . . five classes of 'controlled substances,' Raich, 125 S. Ct. at 2210, whereas the regulatory scheme at issue here deals only with child pornography – not all forms of pornography, nor all forms of child abuse. In our view, however, the CSA was constitutionally "comprehensive" in that it regulated an entire market for a commodity, as opposed to the isolated, discrete acts that were the subject of regulation in Lopez and Morrison. We find nothing in Raich to suggest that the outcome would have been different had Congress chosen to regulate comprehensively the marijuana market alone and not the markets for the several classes of drugs it ultimately decided to regulate. As such, Congress's regulation of the child pornography market is similarly "comprehensive" in the constitutionally-relevant sense.

pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials; the sexualization and eroticization of minors through any form of child pornographic images . . . encourag[es] a societal perception of children as sexual objects and lead[s] to further sexual abuse and exploitation of them; and . . . prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children . . . .

Pub. L. No. 104-208, § 121, 110 Stat. at 3009-27.  Cf. Raich, 125 S. Ct. at 2206 - 07 ("Just as the Agricultural Adjustment Act was designed 'to control the volume [of wheat] moving in interstate and foreign commerce in order to avoid surpluses . . .' and consequently control the market price, a primary purpose of the CSA is to control the supply and demand of controlled substances in both lawful and unlawful drug markets. . . . In both cases, the regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity." (first and second alterations in original) (citation omitted) (quoting Wickard, 317 U.S. at 115, 63 S. Ct. at 84)).

In our earlier opinion, we deemed these findings insufficient to sustain the legislation because the record contained no evidence to indicate that Maxwell's

16

individual conduct was likely to impact interstate commerce, and the aggregation approach was inapplicable to non-economic intrastate activity. Maxwell, 386 F.3d at 1059. Not only does Raich expressly contradict the latter component of this analysis, but the Court specifically notes "we have never required Congress to make particularized findings in order to legislate." Raich, 125 S. Ct. at 2208. Our task here, then, is not to determine whether Congress made findings that Maxwell's conduct substantially affected interstate commerce, but whether Congress could rationally conclude that the cumulative effect of the conduct by Maxwell and his ilk would substantially affect interstate commerce – specifically the interstate commerce Congress is seeking to eliminate. Viewed in this light, there is nothing irrational about Congress's conclusion, supported by its findings, that pornography begets pornography, regardless of its origin. Nor is it irrational for Congress to conclude that its inability to regulate the intrastate incidence of child pornography would undermine its broader regulatory scheme designed to eliminate the market in its entirety, or that "the enforcement difficulties that attend distinguishing between [purely intrastate and interstate child pornography]," id. at 2209, would frustrate Congress's interest in completely eliminating the interstate market. It is well within Congress's authority to regulate directly the commercial activities constituting the interstate market for child pornography, and

17

"[p]rohibiting the intrastate possession . . . of an article of commerce is a rational . . . means of regulating commerce in that product."  Id. at 2211.

Our prior opinion also relied heavily on our determination that the jurisdictional element of section 2252A(a)(5)(B) would not guarantee, through case-specific analysis, that any particular conduct had a substantial effect on interstate commerce.  Maxwell, 386 F.3d at 1061.  Nothing in Raich causes us to question that conclusion, nor to second guess our determination that, where a jurisdictional element is required, a meaningful one, rather than a "pretextual incantation[] evoking the phantasm of commerce," id. at 1062, must be offered.  Our understanding of Raich, however, leads us to the conclusion that it is within Congress's authority to regulate all intrastate possession of child pornography, not just that which has traveled in interstate commerce or has been produced using materials that have traveled in interstate commerce.  Cf. supra note 2; Maxwell, 386 F.3d at 1063 n.21 ("On the reasoning of some of our sister circuits, the possession of pornography, even when wholly intrastate, inherently affects interstate commerce.  On this view (which we do not share), it seems that the origin of production materials is constitutionally irrelevant, and Congress thus has authority to regulate the intrastate possession of pornography more closely than it already has by the terms of § 2252A.").  That Congress has not elected to

18

criminalize possession of all child pornography does not impact our constitutional analysis. We do not believe we should encourage Congress to regulate to the fullest extent of its authority by penalizing it for declining to do so. Here, Congress has not chosen to be as invasive as it could have been. It would be a troubling victory for federalism if Congress's authority were resultantly constricted.[8]

We note that we are not the first circuit to have considered the constitutionality of 18 U.S.C. § 2252A(5)(B) in light of the Supreme Court's decision in Raich. The Fourth Circuit, in rejecting such a challenge, noted that "[t]he case at hand is strikingly similar to Raich." United States v. Forrest, 429 F.3d 73, 78 (4th Cir. 2005). Concluding that it could "only hold that Raich

---

[8] We recognize that by leaving a segment of the child pornography market unregulated, the argument that Congress's inability to reach wholly intrastate activity would frustrate enforcement of the interstate market is somewhat undermined. We believe, however, that there are two responses to such an argument that minimize its force. First, ease of enforcement is only one of the concerns prompting Congress's regulation of intrastate possession; Congress is also concerned about the intrastate activity triggering demand in the interstate market. Congress could rationally conclude that it need only address most, but not all, intrastate child pornography (and thereby intrude on traditional state authority to a lesser extent) to allay effectively this concern. Second, the realities that prompted us earlier to question the efficacy of the jurisdictional element play in favor of congressional authority here: The intrastate possession of child pornography produced using purely intrastate materials is a class of activity that simply does not exist in modern society. See Maxwell, 386 F.3d at 1063 ("We have struggled to conceive of a possessor of child pornography who would not be subject to federal prosecution if Maxwell is. . . . We strongly suspect that it would be impossible in today's world to develop a picture without utilizing a material, somewhere down the line, that originated beyond the borders of the state in which the picture was taken."). As such, to the extent ease of enforcement is frustrated at all, it is to a minuscule degree.

19

controls the present analysis," id. at 79, the court found there was a rational basis for Congress to determine "that the local production and possession of child pornography substantially affect interstate commerce," id. Accordingly, the court held that Raich "makes clear that no error resulted from applying §§ 2251(a) and 2252A(5)(B) to [defendant's] wholly intrastate production and possession of child pornography." We readily agree with the Fourth Circuit's analysis.

Thus, we hold that 18 U.S.C. § 2252A is a valid exercise of Congress's authority pursuant to the Necessary and Proper Clause to effectuate Congress's power to regulate commerce among the several states.

**IV**.

For the foregoing reasons, and those expressed in the reinstated sections of 386 F.3d 1042 (11th Cir. 2004), the judgment of the district court is

**AFFIRMED.**

EDMONDSON, Chief Judge, CONCURS in the result.